# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

CLARE GENIOARA BIRKEDAL,

    Plaintiff,

vs.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

    Defendant.

No. 20-CV-3020-KEM

**MEMORANDUM OPINION AND ORDER**

_____

Plaintiff Clare Genioara Birkedal seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Birkedal argues the ALJ erred in determining she did not meet the "paragraph C" criteria of Listing 12.04 and 12.06; in evaluating the medical-opinion evidence; and in formulating her residual functional capacity (RFC). I recommend **reversing** the ALJ's decision and **remanding** for further proceedings.

## I.    *BACKGROUND*[2]

Birkedal was adopted from Romania at age eighteen months. Doc. 17. She

---

[1] Kilolo Kijakazi is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] The parties have provided a more thorough overview of the treatment records in the Joint Statement of Facts (Doc. 17).

suffered developmental problems as a child due to her likely exposure to alcohol in the womb and inadequate nutrition and stimulation while in a Romanian orphanage. *Id.* Birkedal took special education classes in high school, graduating with her diploma in 2008. AR 563, 684. She attended community college on a basketball scholarship but dropped out before the end of the first semester due to alcohol use. AR 465, 639. From 2008 to 2011, Birkedal lived with her parents and sporadically worked part-time at grocery stores and fast-food restaurants, with her longest employment (as a deli clerk at the grocery store) lasting from September 2009 to November 2010. AR 320. During this time, Birkedal abused alcohol, and she reported losing jobs due to nonattendance or smelling of alcohol. AR 427, 464-65.

In 2012, at age 22, Birkedal began using methamphetamine. *See* AR 464. She lived in a rental house in her hometown from October 2012 to February 2014 until she was evicted, and she largely bounced around hotels in Minneapolis in 2015 and 2016. AR 465, 638, 640, 642, 766-67. During this time, she was financially supported by an older man who purchased cars, methamphetamine, phones, and hotel rooms for her, and she had little contact with her parents. *Id.* She did not work.

Few treatment notes exist in the record from 2012 to summer 2016. *See* AR 430-41; *see also* AR 471, 642. Birkedal moved back in with her parents, and she obtained a neuropsychological evaluation from Brent Seaton, PhD, in September 2016; Dr. Seaton had previously evaluated her when she was in high school in 2006. *See* AR 455-69. On both occasions, Dr. Seaton's intelligent quotient (IQ) testing reflected Birkedal had borderline intellectual functioning (her full scale IQ score was 77 in 2006 and 76 in 2016). *Id.* In October 2016, Birkedal began seeing a psychiatric nurse practitioner for medication management, and she continued to meet with her every month or two through May 2017. *See* AR 485-504.

In March 2017, Birkedal's parents obtained a voluntary conservatorship over Birkedal (prohibiting her from contacting the older man who supplied her drugs). AR

642. Shortly thereafter, on March 19 and March 21, Birkedal filed applications for DI and SSI benefits, alleging disability since December 2011 due to various mental impairments, including developmental disorder, bipolar disorder, attention deficit hyperactivity disorder (ADHD), autism spectrum disorder features, and borderline to low-average ability. AR 11, 115.

While living with her parents, Birkedal continued to use methamphetamine daily. AR 524, 555. On August 22, 2017, her parents obtained a court-ordered mental-health commitment for Birkedal after she came home with burns and bruises on her arms and made threatening statements. AR 515, 520. Birkedal was hospitalized on the psychiatric ward from August 22 through August 30, 2017. AR 515-26. Upon discharge, she was ordered to a "transition center" and intensive outpatient program, from which she escaped on September 5. AR 538. Birkedal was found by police on September 7. AR 538, 547. She was once again hospitalized on the psychiatric ward from September 8 to 20, 2017, as she had been drinking, using methamphetamine, and not taking her medications. AR 538-41. Upon discharge, Birkedal began living at Prairie View, an inpatient residential facility (as ordered by the court). AR 638.

Birkedal lived at Prairie View from September 2017 to May 2018. *See* AR 682, 749. She got clean and regularly saw a psychiatrist and attended therapy with Laurie Thein, LMHC (Therapist Thein). AR 556. In early 2018, she worked in the kitchen at Prairie View to obtain money for a court fine, but she did not complete tasks, and kitchen staff noted they did not know if they wanted her back in the kitchen "after her incident with the alcohol wipes." AR 645.

On May 21, 2018 (still under court-ordered commitment), Birkedal began living at the Pride Group Home, a little less than three hours from her hometown. AR 682, 718, 749, 826. Birkedal lived with three other women who have more severe intellectual disabilities than she, and staff were present twenty to twenty-four hours a day. *Id*. Birkedal lived at the Pride Group Home through the time of the ALJ's decision in April

3

2019. She mostly maintained her sobriety, with a few lapses after visits to her hometown (where she saw her old friends and used methamphetamine) and while on vacation with her family (where she drank alcohol). AR 721, 736, 738, 804, 809, 816. She had monthly appointments with psychiatric physician's assistant Laurie Warren (PA Warren) for medication management but did not attend therapy. AR 798-816. Birkedal also worked several part-time jobs while living at Pride Group: she worked the deli department at a grocery store in July 2018; she worked the deli department at a different grocery store from August to December 2018; and she worked at a nursing home from January 2019 to the time of the ALJ hearing in early April 2019, preparing plates of food and bringing them to residents. AR 76-77, 753, 804, 806, 822.

The Social Security Administration denied Birkedal's DI and SSI applications initially in August 2017 and on reconsideration in October 2017. AR 11. Birkedal requested review before an ALJ. On April 2, 2019, the ALJ held a video hearing, at which Birkedal, her parents, and a vocational expert (VE) testified. *Id.* On April 24, 2019, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[3] to determine whether Birkedal was entitled to disability benefits. AR 11-21. The ALJ found Birkedal suffered from the following severe impairments: drug and alcohol abuse, depression/bipolar disorder, neurodevelopmental disorder, and personality disorder. AR 14. At step three, the ALJ found Birkedal's impairments did not meet or equal any listing, including Listings 12.04 and 12.06. *Id.* To aid in the evaluation whether Birkedal could work, the ALJ determined she had the following

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005) (quoting **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004)).

4

RFC[4]:

> [Birkedal] has the [RFC] to perform a full range of work at all exertional levels, but with the following non-exertional limitations: [Birkedal] is limited to simple, unskilled work tasks with no more than occasional simple work-related decisions, problem solving, and use of independent judgment; can tolerate only occasional interaction with co-workers and the general public; due to limitations in maintaining focus, attention, and concentration, may be off-task for as much as 5% of the workday; cannot perform work that is defined by the DOT or the SCO as high-stress work, such as first-responder work (e.g., police, fire-fighting, or ambulance); can tolerate only occasional changes in the work setting or work tasks; and should not be required to set her own work goals or daily work tasks.

AR 16. The ALJ found Birkedal had no past relevant work, but based on her age, education, work experience, and RFC, the ALJ found that a significant number of other jobs existed in the national economy that Birkedal could perform, such as kitchen helper, garment sorter, and folder. AR 20-21. Accordingly, the ALJ concluded that Birkedal was not disabled. AR 11-21.

Birkedal appealed. The Appeals Council denied Birkedal's request for review on April 7, 2020 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[5] Birkedal filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 4).[6] The parties briefed the issues (Docs. 17-18, 20-21) and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 12).

## II.   DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence

---

[4] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**).

[5] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[6] *See* **20 C.F.R. § 422.210(c)**.

in the record as a whole."[7] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[8] The court "do[es] not reweigh the evidence or review the factual record de novo."[9] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[10]

Birkedal argues that substantial evidence does not support the ALJ's step-three finding that she did not meet Listings 12.04 and 12.06. She also argues that the ALJ did not give good reasons for discounting the medical opinions evaluating her RFC. Relatedly, she argues that substantial evidence does not support the ALJ's RFC determination.

### A. Listings 12.04 and 12.06

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1.[11] "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."[12] A claimant can equal the listings in one of three ways:

> (1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—

---

[7] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[8] *Kirby*, 500 F.3d at 707.

[9] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[10] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

[11] **20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)**.

[12] **20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3)** (citation omitted).

> > (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
> >
> > (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
>
> (ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.
>
> (2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.
>
> (3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.[13]

"To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'"[14]

Birkedal argues that her impairments meet Listings 12.04 (governing depressive, bipolar, and related disorders) and 12.06 (governing anxiety and obsessive-compulsive

---

[13] **20 C.F.R. §§ 404.1526(b), 416.926(b)**.

[14] ***KKC ex rel. Stoner v. Colvin***, 818 F.3d 364, 370 (8th Cir. 2016) (quoting ***Sullivan v. Zebley***, 493 U.S. 521, 531 (1990)). *Sullivan* in turn relied on the following regulatory language: "a claimant's impairment is 'equivalent' to a listed impairment 'if the medical findings are at least equal in severity' to the medical criteria for 'the listed impairment most like [the claimant's] impairment.'" 493 U.S. at 531 (alteration in original) (quoting **20 C.F.R. § 416.926(a)** (1989)). The essentials of this regulatory language remain in effect today: "What is medical equivalence? [A claimant's] impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." **20 C.F.R. §§ 404.1526(a), 416.926(a)**.

7

disorders). Both Listings require proof of "paragraph A" criteria, which differ between the two, as well as either the "paragraph B" or "paragraph C" criteria, which are the same for both Listings.[15] Rather than addressing the paragraph A criteria, the ALJ found that Birkedal could not meet the paragraph B and paragraph C criteria. AR 14-16. Birkedal does not challenge the ALJ's finding with respect to paragraph B, but she argues the ALJ erred in finding her impairments did not meet paragraph C.

> Paragraph C requires:
>
> [The claimant's] mental disorder in this listing category is "serious and persistent;" that is, [the claimant] ha[s] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
> 1. Medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder; and
> 2. Marginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life.[16]

The regulations further explain:

> b. The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial supports, or a highly structured setting, to diminish the symptoms and signs of your mental disorder. We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.

---

[15] **20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06**.

[16] ***Id.*** (cleaned up).

> c. The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports. Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.[17]

The ALJ found that Birkedal's impairments did not meet the second requirement of Paragraph C (the ALJ did not discuss the first requirement). AR 15. The ALJ concluded that Birkedal's ability to adapt to change was more than minimal, noting she "has been able to file claims for disability benefits, complete and submit necessary documents, and obtain a representative, all activities outside her usual routine." *Id.* As Birkedal notes, however, her parents filed her disability applications on her behalf upon obtaining a conservatorship and assisted her with the necessary paperwork. *See* AR 193-95, 348.

Nevertheless, I agree with the ALJ's overall conclusion that there is no evidence of marginal adjustment (as necessary to meet or equal the C2 criterion). Birkedal relies generally on evidence that she lives in a group home, but if this were enough to meet paragraph C, paragraph C would consist entirely of the C1 criterion (without the C2 criterion). In function reports completed in May 2017, Birkedal reported that she does not handle changes in routine well, and her mother stated it would depend on the circumstances, noting that Birkedal has difficulty regulating her emotions and could feel

---

[17] *Id.* § **12.00(G)(2)(b)-(c)** (cleaned up).

"disrupted" by a change in routine. AR 339, 347. But Dr. Seaton and Therapist Thein did not mention difficulties adapting to change when opining on Birkedal's barriers to competitive employment (instead noting impulse-control issues, limited frustration tolerance, and cognitive limitations). AR 469, 691. Therapist Thein noted Birkedal could perhaps work a part-time job, particularly one that involved animals and limited contact with people. AR 469, 691. And indeed, as the ALJ noted, Birkedal has been able to work at several part-time jobs while living in the group home, and there is no evidence that starting new jobs (and changing her routine) affected her mental health. The evidence does not support that "changes or increased demands" exacerbated Birkedal's mental-health symptoms such that Birkedal meets the "marginal adjustment" criterion.[18]

The ALJ did not err in finding Birkedal's impairments did not meet or equal paragraph C (and therefore did not meet or equal Listings 12.04 and 12.06).

### B. Weight to Opinion Evidence and RFC

Birkedal challenges the weight the ALJ assigned to Dr. Seaton's neurological consultative examination and to Therapist Thein's opinion of Birkedal's limitations contained in a treatment note. She also argues that when formulating her RFC, the ALJ improperly focused on "good periods" rather than the longitudinal record. Thus, Birkedal argues substantial evidence does not support the ALJ's RFC determination.

When determining a claimant's RFC, the ALJ considers medical and other RFC opinions "together with the rest of the relevant evidence."[19] The ALJ considers the

---

[18] *Cf. Smith v. Saul*, No. 1:19-CV-00048 SRC, 2020 WL 5107343, at *6 (E.D. Mo. Aug. 31, 2020) (finding that repeated hospitalizations showed that claimant's "adaption to the requirements of daily life is fragile," especially when one such hospitalization "occurred after increased demands on [claimant's] life due to her daughter's birthday"; also noting minimal activities of daily living during bad periods).

[19] **20 C.F.R. §§ 404.1527(b), 416.927(b)**.

following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."[20]

Dr. Seaton conducted a neuropsychological evaluation in September 2016 (prior to Birkedal being placed under a conservatorship). AR 463-49. He observed that Birkedal was easily distracted during tests and that she had difficulty tolerating frustration during testing (due to Birkedal's frustration tolerance, Dr. Seaton stopped testing early and had Birkedal finish testing the next day, giving her long breaks). He also noted Birkedal's parents said she lacked social awareness, had poor frustration tolerance, impulsively spent money, and had memory problems and difficulties taking her medications. Dr. Seaton's testing results showed an IQ score of 76, in the borderline intellectual functioning range. He concluded that Birkedal's problems during testing showed difficulties with sustained attention and vigilance, inefficient visual memory, and problems with retaining complex verbal information. He opined that Birkedal's difficulties with attention, learning, and memory would impact her ability to consistently learn and retain necessary information in work settings. He also noted her moods and limited frustration tolerance would impact her ability to interact with others. Dr. Seaton's results were consistent with neuropsychological testing he conducted while Birkedal was in high school (in which he found an IQ score of 77 and noted difficulties with concentration, memory, and controlling her temper). AR 455-62.

---

[20] *Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**); *see also* **20 C.F.R. §§ 404.1502(a), 404.1527(f), 416.902(a), 416.927(f)** (same factors apply to opinions from nonacceptable sources like Therapist Thein).

Therapist Thein's opinion is similar. Birkedal attended therapy with Therapist Thein for about six months while living at Prairie View under court-ordered commitment. AR 684-91. In Therapist Thein's discharge summary, she noted that Birkedal is challenging to work with, stating she presents as smiling "but doesn't appear to comprehend that her smiles don't hide the frustration and low tolerance levels that she exhibits on a daily basis." AR 690-91. She also noted Birkedal's moods had fluctuated between high anxiety and anger and fear at not being accepted. *Id.* She concluded:

> [Birkedal] will likely need assistance throughout her lifetime. She may[ ]be able to work a part[-]time job[,] and working with animals is suggested as she is able to show emotional attachment to animals but not people. Holding a job full[-]time is not likely due to her high anxiety at being around people, reactive attachment disorder, mood fluctuations[,] and poor communication and comprehension skills. She is highly impulsive and if living on her own tends to get back into the negative crowds that increase her chance of substance abuse regression. She will need to continue working with her psychiatrist on medications and having a supportive staff to assist her with daily instructions.

AR 691.

The ALJ assigned Dr. Seaton's opinion "some weight," finding his conclusions supported by the narrative of the report. AR 19. But he declined to fully credit Dr. Seaton's opinion, finding that it did not appear Dr. Seaton reviewed any treatment records and that his opinion was inconsistent with the record as a whole (the ALJ did not explain how Dr. Seaton's opinion was inconsistent with the record). The ALJ also noted Dr. Seaton assumed Birkedal was clean at the time of the examination, but Birkedal was likely abusing substances during that time period. The ALJ did not discuss Therapist Thein's opinion, other than noting that her finding that Birkedal could not hold a full-time job invaded the province of the Commissioner and was entitled to no weight. AR 19.

The ALJ's reliance on Birkedal's substance abuse to discredit Dr. Seaton's opinion is indicative of a larger problem with the entirety of the ALJ's RFC analysis. Throughout his discussion of Birkedal's RFC, the ALJ discounted evidence of Birkedal's mental-

12

health symptoms, attributing it to her substance abuse. But when a claimant suffers from alcoholism or drug addiction, the ALJ must first "determine whether [the claimant] is disabled . . . . using the standard five-step approach . . . without segregating out any effects that might be due to substance use disorders."[21] Only once the ALJ determines the claimant is disabled (considering the effects of substance abuse) does the ALJ then consider "which limitations would remain when the effects of the substance use disorders are absent."[22]

Here, because the ALJ did not find Birkedal disabled (even when considering her substance abuse), the ALJ's RFC determination must include any limitations caused by that substance abuse. Thus, that Dr. Seaton's findings may have been impacted by Birkedal's substance abuse is no reason to discount his opinion. In any event, it seems unlikely that the results of Dr. Seaton's testing were impacted by Birkedal's substance abuse (as found by the ALJ), given that his results in 2016 were largely the same as earlier testing in 2006 before Birkedal's substance abuse began.

In determining Birkedal's RFC, the ALJ noted "[m]ental status examinations varied" depending on Birkedal's substance abuse, suggesting examinations in which providers noted anxiety, psychotic thoughts, irritability, hyperactive moods, deficient impulse control, and lack of judgment and insight could be contributed to her substance abuse, while examinations were "normal" when she was clean. AR 17. Substantial evidence does not support this finding. The record is replete with evidence that Birkedal is difficult to get along with (and may have an autism diagnosis), has limited frustration tolerance, and angers easily (whether clean or abusing substances). Providers frequently noted that Birkedal was irritable. AR 497, 500, 523, 539, 685, 687, 689, 800, 808-09, 816-17; *but see* 555, 679, 796 (pleasant); AR 802, 804, 811 (no irritability). Notes from Therapist Thein and Prairie View reflect Birkedal lacks social skills and is easily over-

---

[21] ***Brueggemann v. Barnhart***, 348 F.3d 689, 694 (8th Cir. 2003).

[22] *Id.* at 693.

13

stimulated, which leads to emotional meltdowns. AR 638, 684. While in Prairie View (and largely without access to illicit substances), staff determined Birkedal needed to attend anger management. AR 655, 657. Birkedal also reported being prone to angry outbursts in an October 2016 assessment. AR 471. Records reflect that she got along with and was friendly to her roommates at the Pride Group Home, but she also was arrested on domestic abuse charges in April 2015 after getting into an argument with her roommate and injuring her by flicking her in the mouth. AR 471, 816, 821. Birkedal also threatened her father (with shaving off his hair, punching him, and death) in August 2017 if he talked to her doctors again. AR 520.

Multiple treatment records also reflect Birkedal's issues with concentration and attention. Birkedal took special education classes throughout high school due to issues sustaining focus. AR 684. She often sought treatment for problems concentrating and sustaining focus due to ADHD (although as the ALJ noted, she was suspected of drug-seeking behavior because she often requested stimulants to treat her ADHD). AR 445, 449, 486, 497, 499, 798-803, 806-07. She also reported issues concentrating and completing tasks at unrelated appointments. AR 472, 687, 689, 753. An intake note from Therapist Thein reflects other providers' opinions that Birkedal has difficulties with memory, concentration, and executive function. AR 685. On the other hand, objective examinations almost always reflect intact memory. AR 429, 447, 486-87, 489, 493, 500, 539, 738, 755, 803, 805, 807, 811, 814, 817; *but see* AR 800 (memory questionable at times). Some treatment records reflect poor to fair attention and concentration on objective examination, but later records show adequate attention and concentration. AR 523, 800, 802-03, 805, 809, 811, 814. Indeed, the treatment records support the ALJ's conclusion that Birkedal's troubles focusing improved once she was living at the Pride Group Home and taking medications regularly. *See* AR 809, 811, 816 (reports can concentrate and focus); *see also* AR 495 (reports medications help focus). Birkedal reported not having difficulties sustaining the concentration and focus necessary to work

14

at the deli counter at the grocery store. AR 808. Overall, the treatment records support that Birkedal could perform simple, unskilled work that allows her to be off-task up to 5% of the work day (as found by the ALJ). But the treatment records also support Dr. Seaton's and Therapist Thein's general statement that Birkedal suffers limitations with paying attention.

The ALJ also found that Birkedal's lack of employment may have been due to her substance abuse and that substance abuse may have contributed to the efficacy of prescribed treatment. AR 18. But there is also evidence that Birkedal's medication noncompliance was due to her mental illness, as objective examinations overwhelmingly show she had limited insight and judgment. AR 487, 489, 492, 495, 497, 500, 503, 539, 803, 811, 817; *see also* AR 486, 523, 800, 805, 809, 814 (fair insight); *but see* AR 447, 755 (intact insight).[23]

When determining Birkedal's RFC, the ALJ also afforded no consideration to the fact that Birkedal lives in a structured group home setting. The ALJ relied on Birkedal's activities of daily living without recognizing the help and support Birkedal receives from staff (under her court-ordered commitment). AR 18. The ALJ noted that Birkedal's symptoms improved during her commitment to Prairie View, when she was forced to abstain from substance abuse. AR 17. Birkedal's medication compliance improved toward the end of the relevant time period because staff at Pride Group Home, where Birkedal lived as the result of a court order, ensured that she took her medications. AR 738, 822.

> Improvement in a . . . mental disorder in a highly structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use.

---

[23] *See **Pate-Fires v. Astrue***, 564 F.3d 935, 946 (8th Cir. 2009) (medication noncompliance cannot be held against a claimant when the noncompliance is the result of mental illness).

**SSR 13-2p, 78 Fed. Reg. at 11945**.

Overall, I agree with Birkedal that the ALJ improperly focused on "good periods" without taking bad periods into account when determining Birkedal's RFC. To the extent the ALJ discounted symptoms due to substance abuse, this was also in error. The treatment records appear to be consistent with Dr. Seaton's and Therapist Thein's opinions. Without any explanation from the ALJ to support his finding otherwise, I cannot say that substantial evidence supports the ALJ's determination to discount Dr. Seaton's and Therapist Thein's opinions. Substantial evidence does not support the ALJ's RFC determination (particularly with respect to Birkedal's ability to work with people).

### III. CONCLUSION

I **reverse** the decision of the Social Security Administration **and remand** for further proceedings. The Clerk of Court is directed to enter judgment in favor of Birkedal.

**SO ORDERED** on March 18, 2022.

_____
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa